# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **MONICA TERPO,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:12-CV-2325-VEH** |
| | ) |
| **RBC BANK (USA) and THE PNC** | ) |
| **BANK, NATIONAL** | ) |
| **ASSOCIATION,** | ) |
| | ) |
| **Defendants**. | ) |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

The court has reviewed the pending Motion for Summary Judgment (Doc. 20) (the "Motion") filed by Defendants on June 20, 2013, and the parties' respective supporting and opposing materials. (Docs. 21-26, 28-30).[1] In her complaint, Plaintiff Monica Terpo ("Ms. Terpo"), has asserted claims arising under the Americans with Disabilities Act of 1990 as amended in 2008 (the "ADAA")[2] and the Family and

---

[1]   The page references to Doc. 21, Doc. 28, and Doc. 30 correspond with the court's CM/ECF numbering system.

[2]   Based upon the absence of any briefing on the issue, evidently there is no disagreement that the ADAA applies to this lawsuit. The parties' apparent stipulation over which law to apply is also consistent with the court's prior ADAA retroactivity analysis as the alleged discriminatory conduct about which Ms. Terpo complains

Medical Leave Act (the "FMLA") against RBC Bank (USA) ("RBC") and PNC Bank, National Association ("PNC") for failing to accommodate her, terminating her employment, and otherwise retaliating against her stemming from her efforts to take care of her "daughter who suffers from one or more conditions which substantially limit her major life activities."  (Doc. 1 ¶ 15).

For the reasons stated below, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.    STANDARDS

### A.    Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th

---

took place <u>after</u> January 1, 2009, *i.e.*, on June 13, 2011, Ms. Terpo was informed that she was being discharged.  This court has previously concluded that in the context of a plaintiff, such as Ms. Terpo, who seeks monetary damages for disability discrimination premised upon an adverse employment action that occurred <u>prior</u> to January 1, 2009, the [ADAA] should <u>not</u> be applied retroactively.  *See generally Richardson v. Honda Mfg. of Ala., LLC*, 635 F. Supp. 2d 1261, 1269-72 (N.D. Ala. 2009) (analyzing whether to apply ADAA retroactively to challenged conduct pre-dating January 1, 2009).  Relying upon *Richardson* as persuasive authority and applying its retroactivity ruling conversely to the discriminatory time frame implicated here, the court will analyze Ms. Terpo's disability-driven claims under the ADAA.

Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### B.    Employment Discrimination Generally

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases in which there is no direct evidence of discrimination.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d

590, 595 (11th Cir. 1987).[3]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

---

[3] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 782 (11th Cir. 1989) (footnote omitted). Based upon this standard, Ms. Terpo's case is purely a circumstantial evidence one. (*See, e.g.*, Doc. 28 at 16 ("Where, as here, there is no direct evidence of discriminatory intent, this court should evaluate a claim of FMLA retaliatory discharge under the same burden-shifting approach employed in Title VII cases.")).

## III.   ANALYSIS[4]

### A.   Ms. Terpo's Uncontested Claims

Ms. Terpo's lawsuit asserts three claims under the ADAA and two under the FMLA:  count one is for ADAA disparate treatment; count two is for ADAA failure to accommodate; count three is for ADAA retaliation; and count four is for FMLA retaliation and interference.  (Doc. 1 at 7-13).  In responding to Defendants' Motion, Ms. Terpo only opposes the entry of summary judgment on her ADAA disparate treatment, FMLA retaliation, and FMLA interference claims.  (*See* Doc. 30 at 11 n.4 ("Plaintiff's Response focuses solely on her association discrimination claim under the ADA found in Count I of her Complaint, and not on her claims for failure to make reasonable accommodation or retaliation found in Counts II and III.")); (*see id.* (Accordingly, it appears that Plaintiff has conceded that her claims in Counts II and III fail as a matter of law and should be dismissed.")).

Such an omission on the part of Ms. Terpo constitutes an abandonment of her failure to accommodate and retaliation claims asserted under the ADAA.  *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary

---

[4]  Given the nature of this court's ruling on summary judgment, it elects not to recite a separate statement of facts.

judgment); *Bute v. Schuller Int'l, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("We decline to exercise our discretion to entertain this argument which was not fairly presented to the district court."); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Hudson v. Norfolk S. Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."); *cf. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint).

Accordingly, the Motion is **GRANTED** with respect to counts two and three of Ms. Terpo's complaint and, thus, both her ADAA reasonable accommodation and retaliation claims are **HEREBY DISMISSED WITH PREJUDICE**.

**B.    Ms. Terpo's Contested Claims**

The court turns to Ms. Terpo's contested claims under the FMLA first.

### 1.    FMLA Retaliation

#### a.    Ms. Terpo has adduced a *prima facie* case.

"To prove FMLA retaliation, an employee must show that his employer intentionally discriminated against him for exercising an FMLA right." *Martin v. Brevard County Public Schools*, 543 F.3d 1261 (11th Cir. 2008) (citing 29 U.S.C. § 2615(a)(2)).  In *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231 (11th Cir. 2010), the Eleventh Circuit set forth the following *prima facie* framework for evaluating FMLA retaliation:

> A *prima facie* case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two. *Smith v. BellSouth Telecomm., Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001). The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were "not wholly unrelated." *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action. *Id.* Temporal proximity alone, however, is not sufficient to establish a causal connection when there is unrebutted evidence that the decision maker was not aware of the protected activity. *Id.* Furthermore, knowledge on the part of persons other than a decision maker cannot be imputed from other supervisors to the decision maker for purposes of an FMLA retaliation claim. *Id.* at 800.

*Krutzig*, 602 F.3d at 1234-35 (emphasis added).

While Defendants concede that Ms. Terpo has satisfied the statutorily protected activity and adverse employment action prongs, they dispute her ability to meet the causal connection element.  (*See* Doc. 21 at 30 ("Here, there is no evidence of any causal connection between Plaintiff's request for FML and her termination.")).  More specifically, Defendants maintain that "the temporal proximity between Plaintiff's request for FML and her termination is insufficient to establish a causal connection where, as here, it is undisputed that the individual who made the decision to terminate Plaintiff, Isaac, was unaware of Plaintiff's FML request."  (Doc. 21 at 30).

Regional Manager Sean Isaac ("Mr. Isaac") made the decision to terminate Ms. Terpo's employment, based upon the recommendation of Charlotte Matthews ("Ms. Matthews"), Ms. Terpo's supervisor, and in consultation with Kimberly Freeman ("Ms. Freeman"), a Senior Consultant in RBC's Human Resources Advisory Services Group.  (*See* Doc. 25-5 at 20-22 (Mr. Isaac's discussing decision-making process culminating in the discharge of Ms. Terpo)); (*see also* Doc. 29-1 at 2 ("DISMISSAL SUMMARY REQUEST" dated June 13, 2011, and "**Recommended By:  Charlotte**

**Matthews**")).[5] Mr. Isaac and Ms. Matthews informed Ms. Terpo about this decision by way of a telephone conference held on June 13, 2011. (Doc. 23-1 at 24 at 224).[6]

While Ms. Matthews was undisputably aware of Ms. Terpo's request for FMLA leave prior to the adverse employment action,[7] Mr. Isaac has denied knowing that Ms. Terpo had applied for FMLA leave on May 31, 2011, when he advised her about the decision to discharge her. (Doc. 25-5 at 25). Ms. Freeman similarly has indicated that she thought she "was made aware after [Ms. Terpo] was terminated because generally [she] wouldn't have a need to know that information." (Doc. 25-6 at 10).

In an effort to rebut this deposition testimony about Mr. Isaac's and Ms. Freeman's lack of knowledge and demonstrate a triable issue as to causation, Ms. Terpo emphasizes that, on June 8, 2013, and less than one week before her dismissal,

---

[5] The page references to Doc. 29-1 correspond with the court's CM/ECF numbering system.

[6] The first page reference to Doc. 23-1 corresponds with the court's CM/ECF numbering system and the second page reference corresponds with the numbering of Ms. Terpo's deposition transcript.

[7] (*See* Doc. 21 at 11 ¶ 37 ("[Ms.] Matthews was notified that [Ms. Terpo] had requested intermittent FML via e-mail on June 1, 2011.")); (Doc. 25-1 at 16 at 63 ("I became aware [of Ms. Terpo's FMLA leave] on June the 2nd because I wasn't actually in the office on the 1st. So about, yeah, June 2nd is the day I read the e-mail.")).

she complained to Jeannette Whitaker ("Ms. Whitaker") in RBC's Human Resources Department that she felt as if Ms. Matthews was retaliating against her for seeking FMLA leave.  Further, Ms. Whitaker testified that she made Ms. Freeman aware of Ms. Terpo's complaint although the record is ambiguous as to the exact timing of when she did this.  (*See* Doc. 29-6 at 3 at 10 ("I logged the notes in our call tracking system and I passed that information along to Kimberly Freeman[, *i.e.*, Ms. Freeman,] who – )).[8]  Ms. Freeman testified that while she could not recall the specific date on which Ms. Whitaker did notify her about Ms. Terpo's leave-related complaint against Ms. Matthews, she did remember that the communication occurred at some point after Ms. Terpo's discharge.  (Doc. 25-6 at 13).

Ms. Terpo also notes that, under company policy, Mr. Isaac and Ms. Matthews should have been made aware of her FMLA-related complaint.  (*See* Doc. 25-5 at 12 (Mr. Isaac's responding to question about who would have been notified with "Myself I would imagine as well as the manager")).  Ms. Terpo additionally relies upon the animosity that she experienced when dealing with Ms. Matthews about her FMLA leave request, including Ms. Matthews's using a hateful tone and stating that the company could request a second medical opinion.  (*See* Doc. 22-2 at 41-42 at 141-

---

[8]   The first page reference to Doc. 29-6 corresponds with the court's CM/ECF numbering system and the second page reference corresponds with the numbering of Ms. Whitaker's deposition transcript.

42) ("[S]he very hatefully said, you know they can check second opinions on medicals . . . Because it sounded to me like she thought I was lying, that they were going to double check me to make sure I was telling the truth."));[9] (*see also* Doc. 22-2 at 48 at 148 (indicating that when Ms. Matthews learned that Ms. Terpo's FMLA leave had been verbally approved on June 13, 2011, Ms. Matthews "immediately got huffy" and "storm[ed] outside on her cell phone, and from her body language you could tell she was not happy.")).[10]   Based upon all these facts, Ms. Terpo contends that a reasonable jury could infer that she has satisfied the causal link.

Reading the record in the light most favorable to Ms. Terpo, a reasonable jury could decide that at least two of the three persons involved in the decision to fire her were familiar with her FMLA leave request prior to that adverse employment action. First, it is beyond dispute that Ms. Matthews had such prior knowledge.  *See supra* note 7, at 9.  Second, depending upon the testimony at trial, a reasonable jury could believe that Ms. Whitaker told Ms. Freeman about Ms. Terpo's FMLA retaliation complaint either on June 8, 2011, or shortly thereafter, and disbelieve Ms. Freeman's

---

[9]  The first page reference to Doc. 22-2 corresponds with the court's CM/ECF numbering system and the second page reference corresponds with the numbering of Ms. Terpo's deposition transcript.

[10]  Ms. Terpo further testified that Ms. Matthews subsequently returned to her office and kept her door shut for the rest of the day.  (Doc. 22-2 at 48 at 148).

insistence that she did not learn about any potential retaliatory issue regarding Ms. Terpo's leave until after Ms. Terpo's discharge on June 13, 2011.

Further, the apparent lack of awareness on the part of Mr. Isaac is not a *Krutzig*-driven defect due to Ms. Matthews's documented status as the recommender behind Ms. Terpo's discharge.   Because of this decision-making dynamic, the court concludes that Ms. Terpo is able to meet the causal prong utilizing a "cat's paw" approach.

As the Eleventh Circuit has summarized this doctrine:

> Under a "cat's paw" theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct.  *See Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam).

*Crawford v. Carroll*, 529 F.3d 961, 979 (11th Cir. 2008).  Here, the record reveals no proof that Mr. Isaac "independently investigated [the] allegations of misconduct" that Ms. Matthews made about Ms. Terpo.   Instead, Mr. Isaac appears to have accepted Ms. Matthews's recommendation and Ms. Freeman's input without even attempting to contact Ms. Terpo.   Thus, the record shows that Ms. Terpo has established a *prima facie* case of  FMLA retaliation.

**b.    Ms. Terpo has adequately shown pretext.**

As justification for the decision to fire Ms. Terpo, Defendants rely upon two security violations admittedly committed by her: the first infraction occurred on April 19, 2011, when Ms. Terpo brought her daughter with her into the branch early in the morning even though no other bank employee was present at that time; the second incident occurred on Saturday, May 21, 2011, and involved Ms. Terpo's daughter's going behind the teller line. (*See* Doc. 29-1 at 2 ("I recommend dismissal based upon these two security violations.")).

Turning to the existence of pretext, the court agrees with Ms. Terpo that the record contains "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" *See MacPherson v. University of Montevallo*, 922 F.2d 766,  776 (11th Cir. 1991) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041,1045 (11th Cir. 1998)).  For example, "[w]hen an employer terminates an employee for a reason which was known to it prior to learning of an employee's protected status, pretext may be inferred." (Doc.  28 at 21-22).

An Eleventh Circuit decision that is illustrative of this principle is *Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821 (11th Cir. 2000):

As for the defendants' other complaints, Dr. Hinson notes that the

> first time many of them were expressed was in response to her EEOC charge of discrimination. Moylan testified that whenever he "had a situation where I felt like we needed to discuss, I felt like me and her sat down and discussed things." His failure to raise an issue could therefore indicate that it was not serious enough to warrant discussion with Dr. Hinson. *Cf. Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir. 1993) (plaintiff showed pretext in ADEA retaliation case when he had received good performance evaluations historically, but "received numerous unfavorable performance evaluations" after filing administrative complaints).

*Hinson*, 231 F.3d at 831 (footnote omitted); *see also Bell v. Potter*, 234 F. Supp. 2d 91, 99 (D. Mass. 2002) (pointing out, in denying the defendant's post-verdict Rule 50 motion, that the plaintiff "had a long history of work-related stress and absenteeism during her nine years of Postal Service employment that proceeded her EEO complaint"); *Bell*, 234 F. Supp. 2d at 99 ("The plaintiff argues that retaliatory animus is evidenced by that fact that it was not until Bell engaged in the protected activity that the Postal Service decided to take action and initiate a series of adverse actions.").

During her deposition, when Ms. Matthews was asked why she waited until June 8, 2011, to ask Ms. Terpo about the May 21, 2011 security issue that she became aware of on May 27, 2011, she responded, "I don't know. That's just basically the way it was handled." (Doc. 25-1 at 23 at 92).[11] Further, although the security breach

---

[11]   The first page reference to Doc. 25-1 corresponds with the court's CM/ECF numbering system and the second page reference corresponds with the numbering of

that took place on May 21, 2011, subsequently became a critical component of the discharge decision, Ms. Matthews did not immediately counsel or otherwise discipline Ms. Terpo when Ms. Matthews first learned from a customer that it had happened.  (Doc. 25-1 at 30 at 119).

Additionally, while Ms. Matthews indicated in her recommended action dated June 13, 2011, that she did not learn about Ms. Terpo's earlier April 2011 security violation until June 10, 2011 (*see* Doc. 29-1 at 2 ("After further investigation, C Matthews learned on 6/10 that on 4/19/11 Monica and her daughter came into the bank early that morning.")), a reasonable jury could conclude otherwise as Andrea Deason ("Ms. A. Deason") testified that she made Ms. Matthews aware of  Ms. Terpo's security violation occurring on April 19, 2011, <u>via email on that same day</u> and certainly not months later.  (Doc. 25-4 at 17-18);[12] (*see also* Doc. 25-4 at 26 (email dated Apr. 19, 2011, from Ms. A. Deason to Ms. Matthews documenting security violation involving Ms. Terpo's daughter)).  Further, Ms. Matthews did not immediately counsel or otherwise discipline Ms. Terpo in April after she received this email from Ms. A. Deason.

---

Ms. Matthews's deposition transcript.

[12]   The page references to Doc. 25-4 correspond with the court's CM/ECF numbering system.

The foregoing disciplinary history involving Ms. Terpo becomes even more suspect given the examples of comparable security violations committed by other employees which Ms. Matthews handled differently both in terms of the degree of the recommended discipline, if any, and the accurateness and/or completeness of her documentation underlying such discipline. (*See* Doc. 28 at 23-27 (detailing incidents of Ms. Matthews's deviations from applicable security policies and highlighting Ms. Matthews's critical omissions in her disciplinary write-up of Ms. Terpo's co-employee and comparator, Stephanie Deason ("Ms. S. Deason"), who had her three-year old son behind the teller line on May 21, 2011,[13] and had previously opened the bank with her husband in violation of the all-clear policy));[14] (*see also* Doc. 25-1 at

---

[13]   On June 14, 2011, Ms. Matthews gave Ms. S. Deason a written warning concerning this security violation and placed her on probation beginning June 15, 2011, and potentially ending on September 15, 2011. (Doc. 29-2 at 1). Even though Ms. Matthews acknowledged during her deposition that Ms. S. Deason's stepson was also present at the bank on May 21, 2011 (Doc. 25-1 at 22 at 87-88), this fact was not included in the writeup.

[14]   As Ms. Terpo specifically testified:

Q.   Well, had you ever -- do you know of anyone else who was in a branch, in your branch, Springville branch, alone with their children?

A.   Not their children, their husband.

Q.   Who else?

12 at 47 (Ms. Matthews's testifying that on reporting security violations "[i]f I was aware of the fact, it would not necessarily be -- wouldn't necessary to report every violation to [human resources].  We would need to review the security policy.")); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) ("Similarly, an employer's deviation from its own standard procedures may serve as evidence of pretext." (citing *Bass v. Bd. of County Comm'rs, Orange County*, 256 F.3d 1095, 1108 (11th Cir. 2001)), *overruled on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008)); *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) ("Departures from normal procedures may be suggestive of discrimination.").

The court acknowledges that Defendants take the position that Ms. Terpo has

---

A.    Stephanie Deason.

Q.    When was Stephanie alone in the branch with her husband?

A.    One morning, it was when he was changing jobs and he was working the night shift, me and [Ms. Matthews] came in to open up and both of their cars were outside empty.  And they had went in the branch and set the all-clear sign.

(Doc. 22-2 at 9 at 109).  Therefore, contrary to Defendants' assertion (Doc. 30 at 9 n.3), Ms. Terpo has provided sufficient evidence to support this comparable fact involving Ms. S. Deason and her husband and, the court cannot accept, on summary judgment, Ms. S. Deason's testimony denying the incident.  Any reference to this prior security violation by Ms. S. Deason was omitted when Ms. Matthews placed Ms. S. Deason on probation for the May 2011 infraction.  (Doc. 29-2 at 1).

no suitable comparators.  In particular, they maintain that Ms. Terpo cannot rely upon

Ms. S. Deason as a comparator because they did not engage in the same misconduct.[15]

However, "[i]n determining whether employees are similarly situated for purposes of

establishing a *prima facie* case, it is necessary to consider whether the employees are

involved in or accused of the same <u>or similar conduct</u> and are disciplined in different

ways."  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis added).

As the Eleventh Circuit aptly explained in *Anderson v. WBMG-42*, 253 F.3d

561 (11th Cir. 2001):

> In arguing that the conduct of comparator employees must be the same
> or nearly identical, WBMG takes the same position rejected by this
> Court in *Alexander v. Fulton County*, 207 F.3d 1303, 1334 (11th Cir.
> 2000).[16]  In that case, the employer defendant contended that the trial
> court had mischaracterized the law by charging the jury that it could find
> discrimination where "another similarly situated employee" was not
> treated in a "similar manner":
>
>> Defendants claim that the term "similarly situated"
>> is ambiguous, and that this [jury] charge miscasts the

---

[15]  Defendants are particularly strident in their briefing about Ms. Terpo's
daughter's handling of coins as a compelling distinction.  (*See, e.g.*, Doc. 30 at 9
("There is no evidence in the record that Stephanie Deason–like Plaintiff–admitted
to allowing her teenage child behind the teller line at the Branch, allowing her
teenage child to handle coins belonging to RBC . . . .")).  However, Ms. Matthews's
dismissal summary request does not reference this detail about the coins as being
critical to her recommended action.  (Doc. 29-1 at 2).

[16]  *Alexander v. Fulton County*, was overruled on other grounds by *Manders v.
Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003).

governing law of this circuit, which they claim requires the "same or nearly identical conduct." Again, we disagree. Although susceptible to manipulation, the phrase "similarly situated" is the correct term of art in employment discrimination law. Moreover, the law does not require that a "similarly situated" individual be one who has "engaged in the same or nearly identical conduct" as the disciplined plaintiff. Instead, the law only requires "similar" misconduct from the similarly situated comparator. *Olmstead v. L.C. by Zirming*, 527 U.S. 581, 119 S. Ct. 2176, 2193, 144 L. Ed. 2d 540 (1999) (Kennedy, J., concurring in the judgment) (characterizing the "normal definition of discrimination" as "differential treatment of *similarly situated* groups" (emphasis added)); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." (emphasis added)); *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1265 (11th Cir.1996) ("Disparate treatment exists when *similarly* situated workers are treated differently even though they have committed similar acts." (emphasis added)); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (holding that in order to show discriminatory discipline, plaintiff must show either that he did not violate the work rule or "that he engaged in misconduct *similar* to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against other persons who engaged in *similar* misconduct" (emphasis added)).

*Alexander*, 207 F.3d at 1334-35.  To the extent that "unprofessional behavior" can be understood by the ordinary use of that term, we reject WBMG's position that the proffered evidence in this case was not relevant as comparator evidence because the conduct of Lockridge and Allen was not identical.  *See id.*

*Anderson*, 253 F.3d at 565 (emphasis by underlining added).

Thus, within the Eleventh Circuit (and if and until the Supreme Court or the Eleventh Circuit en banc holds otherwise),[17] the misconduct engaged in does not have to be identical or even nearly identical in order for another employee to be a valid comparator. *Cf. McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 283 n.11, 96 S. Ct. 2574, 2580 n.11, 49 L. Ed. 2d 493 (1976) ("Of course, precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas*, an allegation that other 'employees involved in acts against (the employer) of [c]omparable seriousness . . . were nevertheless retained . . .' is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.").

Additionally, to the extent that Defendants are correct that Ms. Terpo lacks any

---

[17] *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir.1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court."). Therefore, even though a published panel of the Eleventh Circuit in *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999), has suggested hat the comparator's conduct must be "nearly identical" before a court can properly consider such evidence in opposition to summary judgment, as *Anderson* illustrates, *Maniccia* is preceded by several other Eleventh Circuit decisions that do not impose such an exacting similarly situated standard on a plaintiff, who is asserting disparate treatment in the workplace.

suitable comparators, as the Eleventh Circuit has clarified, the absence of acceptable

comparator evidence will not always dispose of a discrimination claim:

> The district court, in dismissing Mitten's claim of race discrimination, did as federal courts routinely do in disposing of cases, like this, in which the plaintiff claims that his employer applied a workplace-conduct rule in violation of Title VII: the court used *McDonnell Douglas*'s burden-shifting framework. In so doing, the district court focused on whether Mitten's termination for his violation of the zero tolerance policy was more severe than the discipline Lockheed imposed on similarly situated black comparators. Mitten's comparators were deemed not "similarly situated," so the court found no tenable claims of race discrimination.  If the record contained no circumstantial evidence from which a jury could otherwise infer that Mitten was fired because of his race, our discussion would end here, and we would affirm the district court's judgment.
>
> However, establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.  Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case.
>
> Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (declaring that, in cases where a plaintiff cannot establish a *prima facie* case, summary judgment only will be "appropriate where no other evidence of discrimination is present." (citations omitted)); *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011) ("To avoid summary judgment . . . the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision."). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by

the decisionmaker." *Silverman*, 637 F.3d at 734 (citations and internal quotation marks omitted); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000) ("[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination.").

A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008) (holding that the plaintiff established a *prima facie* case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (stating that the circumstantial evidence necessary to present a Title VII case of discrimination under *McDonnell Douglas* is "flexible and depend[s] on the particular situation" (citations omitted)); *cf. Burke–Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1325 (11th Cir. 2006) (affirming the district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented *no other circumstantial evidence suggesting racial discrimination*" (emphasis added)). Yet, no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.

*Smith*, 644 F.3d at 1327-28 (footnotes omitted) (emphasis by underlining added).

Therefore, even if Ms. S. Deason does not fully constitute a valid comparator of Ms. Terpo, there is still other circumstantial evidence (as discussed above) which reasonably suggests the presence of FMLA retaliation in the decision to discharge her. *Cf. Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) ("The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" (quoting *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996))).

In sum, "[t]he evidence presented by plaintiff[] is sufficient to allow a jury in the exercise of impartial judgment to conclude that [Defendants'] proffered explanations are unworthy of belief." *MacPherson*, 922 F.2d at 776. Alternatively, a reasonable jury could equally conclude that Defendants' articulated reasons for discharging Ms. Terpo are legitimate and not a pretext for FMLA retaliation.

Accordingly, the Motion is **DENIED** regarding Ms. Terpo's claim for FMLA retaliation.

### 2.    FMLA Interference

Different issues are presented by the FMLA interference claim. To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001). The employee need not allege that his employer intended to deny the benefit, because "the employer's motives are irrelevant." *Id.* at 1208.

*Krutzig*, 602 F.3d at 1235.

Relying primarily upon *Krutzig*, Defendants contend that summary judgment is appropriate on Ms. Terpo's FMLA interference claim because "[g]iven Plaintiff's

admitted violations of RBC policy in the instant case, there can be no doubt that Plaintiff would have been terminated regardless of her request for FML." (Doc. 21 at 29). *Cf. Krutzig*, 602 F.3d at 1236 ("[T]he unrebutted evidence that the decision maker was not aware, at the time of the decision to terminate Krutzig, of her request to commence FMLA leave establishes as a matter of law that Krutzig's termination was for reasons other than her requested leave.").

Ms. Terpo responds that she was fired "two (2) days before her FMLA [leave] was scheduled to begin (interfering with her right to take FMLA leave)" and that "the evidence does not unequivocally demonstrate [Ms.] Matthews would have recommended Mrs. Terpo's termination based on the alleged security violations known to her before she learned that Mrs. Terpo intended to take FMLA leave." (Doc. 28 at 28).

Consistent with the court's prior discussion of the distinguishing factors that this case contains as compared with *Krutzig*, a reasonable jury could find for Ms. Terpo on her FMLA interference claim if the jury agreed with Ms. Terpo that her discharge from employment was retaliatory under the FMLA. Accordingly, the Motion is **DENIED** regarding Ms. Terpo's claim for FMLA interference.

### 3.    ADAA Association Disparate Treatment

#### a.    Ms. Terpo has adduced a *prima facie* case.

A plaintiff attempting to establish a *prima facie* case of "association discrimination" under the ADA must establish: (1) that she was subjected to an adverse employment action; (2) that she was qualified for the job at that time; (3) that her employer knew at that time that she had a relative with a disability; and (4) that "the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in [the employer's] decision." *Id.* at 1230-31.

*Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).  Defendants

dispute Ms. Terpo's ability to satisfy the second, third, and fourth elements of her

ADAA association claim.

Regarding the second prong, Defendants contend that Ms. Terpo was not

qualified for her position because of her repeated violations of RBC policy.  (Doc. 21

at 20).  Ms. Terpo counters by citing *Young v. General Foods Corp.*, 840 F.2d 825,

829-30 n.3 (11th Cir. 1988),[18] and arguing that she should be entitled to an inference

--------

[18] In *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493 (11th Cir. 1987), cited in *Young*, the Eleventh Circuit noted that:

[T]he *McDonnell Douglas* test has been modified in cases where a plaintiff was discharged from a previously held position (as opposed to failure to hire or to promote cases): "the prong requiring proof of qualification is removed and plaintiff must prove not only that the employer replaced him outside the protected group but also specifically had sought to replace him with a younger person." *Pace*, 701 F.2d at 1386.  The reason for this modification is that in cases where a plaintiff

of qualification because she "was executing the duties of her position at the time of her termination." (Doc. 28 at 29).

Assuming that meeting the qualification prong is essential despite Eleventh Circuit published authority, such as *Rosenfield*, acknowledging that sometimes the element should be dropped from the *prima facie* formulation when the adverse employment action is a discharge, the court finds that Ms. Terpo's tenure as a bank employee for over two years and the absence from the record of any pre-termination disciplinary measures or reviews indicating that her job performance was poor,[19] a reasonable jury could conclude that she was qualified for her position.

With respect to the third element, Defendants maintain that because Ms. Matthews "had known about Plaintiff's daughter's condition for years before

––––––––––––––––––––

> has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred. *Id.* at 1386 n.7. It would appear, therefore, that any disagreement between parties regarding whether a particular plaintiff was adequately performing his job would be brought out at the stage of the proceedings when the defendant articulates legitimate reasons for the discharge and the plaintiff shoulders his burden of proving that the reasons are pretextual.

*Rosenfield*, 827 F.2d at 1495 n.2.

[19] Prior to the termination of her employment, Ms. Terpo had not been disciplined in any manner or even impressionably counseled about how to improve her work performance. (Doc. 22-1 at 29).

26

Plaintiff's termination [this] undercuts any inference of a causal connection between this condition and the termination." (Doc. 21 at 20-21). The two case authorities upon which Defendants rely are, however, both non-binding district court decisions and only one of them involves an <u>association</u> disability claim.[20]

Additionally, Ms. Terpo points out that, during the EEOC stage, Defendants took an inconsistent position about Ms. Matthews's knowledge indicating instead that "Ms. Terpo failed to communicate any such disabling condition of her daughter to her supervisor, or otherwise request accommodation to somehow care for her daughter while at work." (Doc. 28 at 30 (internal quotation marks omitted) (quoting Doc. 29-5 at 6)). In light of Defendants' two diametrically opposed positions, the court determines that a reasonable jury could conclude that Ms. Terpo is able to satisfy the

---

[20]   Under Ms. Terpo's version of events, it was not until her daughter's disability had a direct effect upon her job through her needing time off to take care of her daughter's medical needs that Ms. Matthews discriminated against her. In this court's view, that makes the causal connection analyses utilized in *Stephenson v. National Alliance Sec. Agency, Inc.*, No. 2:10–CV–0881–AKK, 2012 WL 1340073, at *6 (N.D. Ala. Apr. 16, 2012) ("Here, Stephenson informed Thompson of her son's disability during her initial interview on April 24, 2009, and accordingly, NASA had full knowledge of her son's disability when it hired Stephenson."); *id.* ("Thereafter, Thompson purportedly discharged Stephenson on August 11, 2009—a span of over three months—because of this same disability.") and *July v. Bd. of Water & Sewer Comm'rs*, No. 11-0635-WS-N, 2012 WL 5966637, at *8 (S.D. Ala. Nov. 29, 2012) ("This lengthy track record of acceptance and accommodation, without any detrimental consequences to defendant's operations or plaintiff's job assignments or career progression, cannot logically be reconciled with the discriminatory animus that July now imputes to MAWSS."), significantly distinguishable.

third element.  *Cf., e.g., Bechtel Const. Co. v. Secretary of Labor*, 50 F.3d 926, 935 (11th Cir. 1995) ("The pretextual nature of Bechtel's terminating Nichols is further demonstrated by Bechtel's <u>shifting explanations</u> for its actions.") (emphasis added); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) ("When pressed on the reason why infomercials were prohibited, Concello <u>shifted</u> from a contract, to a non-compete agreement, to an unwritten policy, to a standard industry practice.") (emphasis added).  Therefore, the court finds that Ms. Terpo has presented enough evidence to meet the third element of her ADAA association claim.

As for Defendants' challenge of the fourth element, the court finds, consistent with its above analysis of Ms. Terpo's FMLA retaliation claim that, Ms. Matthews's negative reaction to Ms. Terpo's request for (and subsequent receipt of oral approval for) leave in order to take care of her disabled daughter and the reliance upon the cat's paw theory of liability with Ms. Matthews's status as the recommender behind Ms. Terpo's discharge, are sufficient to create a triable issue concerning the disability of her daughter as a determining factor in the decision to discharge her.

### b.    Ms. Terpo has adequately shown pretext.

In rejecting Defendants' contention that Ms. Terpo is unable to demonstrate pretext because of the security violations that she committed on May 21, 2011, and April 19, 2011, the court adopts the same analysis that it underwent when addressing

Ms. Terpo's FMLA retaliation claim, and concludes that, upon this record, reasonable minds could differ over whether Defendants' stated reasons for firing Ms. Terpo were legitimate or whether ADAA association disability by Ms. Matthews, through her recommendation to Mr. Isaac to fire Ms. Terpo, was the real reason.

## IV.  CONCLUSION[21]

Therefore, the Motion is **GRANTED IN PART** and **DENIED IN PART**. Further, counts two and three of Ms. Terpo's complaint are **HEREBY DISMISSED WITH PREJUDICE**.  Finally, an order setting this case for a final pretrial conference on Ms. Terpo's surviving claims for FMLA retaliation, FMLA interference, and ADAA association disability will follow.

**DONE** and **ORDERED** this the 2nd day of October, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[21]  The court acknowledges that Ms. Terpo has requested the opportunity to present oral argument.  (*See* Doc. 28 at 1 (including "ORAL ARGUMENT REQUESTED" in case caption)).  However, given the straightforward nature of the issues involved in the Motion, the court, in its discretion, elects not to hold a hearing, and Ms. Terpo's request is, therefore, **DENIED**.